IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| **In the Matter of the Search of:**<br><br>An **Armor 7E Cellular Telephone** belonging to Alex Kai Tick CHIN, currently located at 210 Kanawha Boulevard West, Charleston, WV 25302 | Case No. 2:23-mj-00102 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Andrew Hayden, being duly sworn under oath, do hereby depose and state:

1. I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed since 2017. I am a graduate of the Criminal Investigations Training Program and the Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations Special Agent Training Program at the Federal Law Enforcement Training Center ("FLETC") at Glynco, Georgia. Prior to HSI, I was the Chief Criminal Investigator for the Missouri Bureau of Narcotics and Dangerous Drugs and a Criminal Investigator for the Missouri Department of Corrections. I have a master's degree in Homeland Security with a primary emphasis in Criminal Justice. My duties as an agent for HSI include, but are not limited to, the investigation and enforcement of Titles 8, 18, 19, 21 and 31 of the United States Code.

2. As part of my daily duties as an HSI Special Agent, I investigate criminal violations relating to child exploitation and child pornography (hereinafter referred to as "child sexual abuse material" or "CSAM") including violations pertaining to the illegal production, distribution, receipt, and possession of CSAM, in violation of 18 U.S.C. §§ 2251 and 2252A and as defined by 18 U.S.C § 2256. I have received training in the area of CSAM and have had the opportunity to observe and review examples of CSAM (as defined by 18 U.S.C. § 2256) in all forms of media including computer and phone media. I have participated in multiple enforcement operations which have involved CSAM offenses.

3. This affidavit is being submitted in support of an application for a search warrant to search an Armor 7E cellular telephone owned by Alex Kai Tick CHIN, hereinafter referred to as the **TARGET DEVICE**, that is stored at 210 Kanawha Boulevard West, Charleston, WV 25302, located in the Southern District of West Virginia. The information to be searched is further described in Attachment A incorporated with this affidavit. This information is to be searched for the items more particularly described in Attachment B that will constitute evidence of violations of production of child pornography, in violation of 18 U.S.C. § 2251, distribution, receipt, and possession of child pornography, in violation of 18 U.S.C. § 2252A, and enticement of a minor, in violation of 18 U.S.C. § 2422(b).

4. The statements contained in this affidavit are based upon my personal knowledge, as well as information provided to me by other law enforcement officials. All observations not personally made by me were related to me by the individuals who made them or were conveyed to me by my review of records, documents, and other physical evidence obtained during this investigation.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 2251, 2252A, and 2422(b) may have occurred. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

6. Based on my training and experience and knowledge of other investigations, I know that some individuals who produce, possess, receive and distribute CSAM often attempt to use different forms of social media applications as a tool to communicate with minors, as well as receive, create, produce, or distribute CSAM contained on cellular telephones and other smart

devices. Based on my training and experience, these individuals will also store electronic media such as videos and photographs on the cellular telephone or other communication device.

## JURISDICTION

7. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## STATUTORY AUTHORITY

8. As noted above, this investigation concerns alleged violations of the following:

   a. 18 U.S.C. § 2251 prohibits a person from employing, using, persuading, inducing, enticing, or coercing a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct if that visual depiction would be or actually has been transported and transmitted by any means of facility of interstate or foreign commerce or in and affecting interstate or foreign commerce.

   b. 18 U.S.C. § 2252A prohibits a person from knowingly receiving, distributing, or possessing any child pornography, or any material that contains child pornography as defined in 18 U.S.C. § 2256(8), using any means or facility of interstate or foreign commerce or that has been mailed or has been shipped or transported in or affecting interstate or foreign commerce, by any means, including by computer.

   c. 18 U.S.C. § 2422(b) prohibits a person from using a means and facility of interstate commerce to persuade, induce, entice, or coerce a minor to engage in sexual activity for which any person can be charged with a criminal offense, including the production of child pornography.

**DEFINITIONS**

9. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

10. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media includes various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

11. Portable media player refers to a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can use

removable storage media. Removable storage media includes various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as calendar, contact list, clock or games.

12. GPS refers to a navigation device using Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

13. Based on my training, experience and research, as well as from consulting the manufacturer's advertisements and product technical specifications available online, I know that the TARGET DEVICE has capabilities that allow it to possible serve as a wireless telephone, digital camera, portable media player, and GPS navigation device, as well as allow the device to connect to the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

14.     "Computer" refers to any electronic, magnetic, optical, electrochemical, or other high speed data processing device capable of performing logical or storage functions and includes any data storage facility or communications facility directly related to such a device.  As used herein, "computer" also incorporates digital devices that complete these same functions, such as smartphones, tablets, connected devices, and e-readers.  See 18 U.S.C. § 1030(e)(1).

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

15.     Based on my training and experience in child exploitation investigations, I am aware that computers, computer technology and the internet significantly facilitate the production, distribution, receipt and possession of child pornography.  Child pornography offenders can transpose photographic images from a camera into a computer-readable format with a scanner.  With digital cameras, smartphones or tablets, the images can be transferred directly onto a computer.  A modem allows any computer to connect to another computer through the use of a telephone, cable, or wireless connection.  Therefore, through use of the Internet, electronic contact can be made with literally millions of computers around the world.

16.     A computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown significantly within the last several years.  These drives can store thousands of images at very high resolution.  Additionally, electronic devices such as smartphones (e.g., Apple iPhones), connected devices, e-readers, and tablets (e.g., Android Tablets, Kindle Fire, Apple iPads) now function essentially as computers with the same abilities to store images in digital form.

17.     The Internet affords collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including, but not limited to, services offered by Internet portals such as Gmail and Outlook. These online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer or device with access to the Internet, and evidence of such online storage of child pornography is often found on the user's computer or device.

18.     Even when files on a computer have been deleted, they can be recovered months or years later using readily available forensic tools. When an individual deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside on the hard drive space that is not allocated to an active file for long periods of time before they are overwritten.

19.     A computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Additionally, files that have been viewed on the Internet are automatically downloaded into a temporary Internet directory or "cache." Browsers typically maintain a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Therefore, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed, and more on the user's operating system, storage capacity, and computer habits.

20.     The facts set forth in this affidavit establish probable cause to believe that a smartphone, its storage devices, a social media account, and other system components were used as

a means of committing offenses involving the sexual exploitation of children, in addition to strong evidence of said crime.

## DETAILS OF THE INVESTIGATION/PROBABLE CAUSE

21. On March 21, 2022, at approximately 7:31 p.m., Alex Kai Tick CHIN ("CHIN") applied for entry at the Paso Del Norte port of entry pedestrian lanes. CHIN presented a duly issued California Driver license and verbally stated he was a United States Citizen. Primary Customs and Border Protection Officer ("CBPO") Alberto Torres asked CHIN what his purpose was in Mexico, and CHIN stated he visited Juarez to walk around and visit a bar. CHIN further stated he was returning to El Paso to continue a road trip back home to San Francisco, California. CBPO Torres conducted a law enforcement query and received a positive match for CHIN as a registered sex offender. CBPO Torres escorted CHIN to Passport Control Secondary for additional screening.

22. At approximately 7:32 p.m., CBPO Ronald Mumma asked CHIN what his purpose was in Mexico. CHIN stated he was on a cross country trip and decided to visit Mexico. CHIN further stated he was in Mexico for an hour or two and got something to eat. CHIN stated he was headed back to San Francisco where he resided. CHIN was traveling with two (2) smart phone devices, a Samsung Galaxy 9 and an Armor 7E (the **TARGET DEVICE**). Supervisor CBPO ("SCBPO") Wally Terrazas approved a basic manual electronic media search. CBPO Mumma advised CHIN of the inspection of electronic devices. CHIN voluntarily unlocked the cell phone devices and provided the password.

23. CBPO Mumma placed the **TARGET DEVICE** on "airplane mode." CBPO Mumma began a manual search of the **TARGET DEVICE** and observed several images of nude females. The females' faces were not visible, and the ages of the females could not be determined.

24. At approximately 7:39 p.m., CBPO Monica McQuality placed the Samsung Galaxy 9 on "airplane mode" and began a manual search of the gallery. CBPO McQuality discovered a photo(s) of what appeared to be an unclothed minor.

25. At approximately 8:20 p.m., SCBPO Wally Terrazas asked CHIN who was the female depicted on CHIN's Samsung Galaxy 9 "locked" screen wallpaper. CHIN advised she was a friend. SCBPO Terrazas asked for the friend's age. CHIN replied 13 years of age. CHIN further stated he has no family relationship as she was only a friend he met on-line and had communicated with her for over 1 1/2 years.

26. At approximately 10:30 p.m., HSI Special Agents ("SA") Jason Grijalva and Ricardo Rubio arrived at the port of entry and began an investigation. Agents conducted a preliminary search of the Samsung Galaxy 9, which resulted in the discovery of 15 photos that were saved in the gallery. The photos appeared to be screen shots taken from Snapchat communication. The photos appear to depict the same female. The female was described as white, approximately 12-14 years of age, with reddish-brown hair and fair colored skin. The photos were saved to the gallery on the following dates: December 12, 2020, January 8, 2021, January 9, 2021, and January 11, 2021. Multiple photos depict the female in a state of undress and expose the child's breasts.  Three photos contain a white female's genitalia. The face of the female is not observed in those photos.

27. Agents observed the following Snapchat account on the Samsung Galaxy 9: Alexander Hamilton, username: karmadinosaur. The Snapchat account contained "offline" recent communication with Snapchat account ("Snapchat Account #1) that was later identified as belonging to Minor Victim #1 ("MV1"). The female depicted on the Snapchat profile matched the

photos saved in the Samsung Galaxy 9's gallery and the Samsung Galaxy 9's "locked" screen wallpaper.

28. At approximately 11:45 p.m., agents read CHIN his Miranda rights. At approximately 11:46 p.m., CHIN invoked his right to speak with an attorney and the interview was terminated. CHIN was subsequently released by CBP. At that time, the Samsung Galaxy 9 and the **TARGET DEVICE** were seized by law enforcement.

29. On March 22, 2022, SA Grijalva conducted a Facebook search for MV1, which resulted in locating a Facebook account. The photos on the Facebook account matched the photos that were saved to CHIN's Samsung Galaxy 9's gallery and the "locked" screen wallpaper. The Facebook account indicated that MV1 was connected to Spring Valley High School. MV1's friend list contained students from Spring Valley High School, which is located at 1 Timberwolf Drive, Huntington, West Virginia 25704.

30. On March 23, 2022, HSI Charleston confirmed the location and date of birth for MV1. The photos discovered of MV1 on CHIN's Samsung Galaxy 9 were saved when MV1 was 17 years of age and a minor child. The photos discovered appeared to be screen shots of Snapchat communication.

31. On March 29, 2022, HSI Forensic Interviewer Candice Cooper conducted a forensic interview of MV1. MV1 identified the "Alexander Hamilton" Snapchat account as someone she had previously blocked on Snapchat because he was pressuring her to do things she did not want to do. MV1 identified Snapchat Account #1 as belonging to her and stated she used it to communicate with "Alexander Hamilton." MV1 stated she was introduced to "Alexander Hamilton" when she was in the eighth grade by Minor Victim #2 ("MV2"). MV1 stated that "Alexander Hamilton" sent her photographs of himself holding a knife to his wrist threatening to kill himself if MV1 did not

send him videos or photographs of herself exposing naked body parts and playing with herself. MV1 advised he would follow this routine on numerous occasions via Snapchat to entice her to send sexually explicit content. MV1 described "Alexander Hamilton" as an Asian male, in his 30s, with long black hair that he kept in a bun. She stated that he dressed like a teenager, wearing t-shirt and ripped jeans. MV1 was presented a photocopy of CHIN's driver's license photograph. MV1 identified the individual in the photograph as "Alexander Hamilton."

32. MV1 stated CHIN would direct her to play with herself with her hands via Snapchat. MV1 stated CHIN sent her numerous videos and pictures of himself playing with his penis.

33. MV1 was presented numerous photographs obtained from CHIN's Galaxy 9, which depicted a female in undress exposing breasts and vagina. MV1 identified the photos as being photos and videos she took of herself while at home. MV1 stated CHIN threatened to kill himself if she did not send the photos and videos. According to MV1, she took the photos and videos when she was 16 and 17 years of age.

34. MV1 explained that approximately one week prior to her interview, while shopping at a Sam's club located in South Point, Ohio, with her sister and foster mother, MV1's sister saw CHIN inside the store. MV1 stated it might be true, because CHIN tried to contact her sister via Snapchat saying he was in town and her sister blocked him. CHIN attempted to meet with MV1, and she also blocked him, according to MV1. MV1 advised that CHIN told her he was traveling throughout the country in his van. MV1 stated that when she told CHIN she had a boyfriend, he became jealous and threatened to kill her boyfriend. CHIN acted like he owned her and acted very rude about it, MV1 explained. According to MV1, CHIN said, "if you like him then I will kill him."

35. On April 1, 2022, HSI Forensic Interviewer Candice Cooper conducted a forensic interview of MV2. MV2 was a 13-year-old minor female who identified the Snapchat account of "Alexander Hamilton" as someone with whom she chatted online. According to MV2, she first began chatting with "Alexander Hamilton" on Snapchat when she was approximately 12 years of age. At that time, MV2 sent a photograph of her naked breasts to "Alexander Hamilton" via Snapchat. The photograph was requested by "Alexander Hamilton." MV2 stated she blocked "Alexander Hamilton" multiple times, but each time he would contact her with a newly created Snapchat account. "Alexander Hamilton" would threaten to kill himself if MV2 discontinued their communications.

36. In approximately February 2022, MV2 believed she saw "Alexander Hamilton" drive past her home in West Virginia in his van. MV2 had seen photographs of the van sent to her by "Alexander Hamilton" via Snapchat communications. The van was white with curtains on the side windows, as described by MV2. During that same month, MV2 was told by MV1's sister and MV1 that they saw "Alexander Hamilton" at a Sam's Club in South Point, Ohio, at which time "Alexander Hamilton" attempted to talk to them. "Alexander Hamilton" had told MV2 he was coming to West Virginia to meet her, but MV2 blocked him on Snapchat prior to meeting him in person.

37. Forensic Interviewer Candice Cooper showed MV2 a photograph copy of CHIN's California driver's license. MV2 identified the individual in the driver's license photograph as "Alexander Hamilton," the same individual with whom she chatted online and to whom she sent the photograph of her breasts.

38. Pursuant to a federal search warrant signed within the Western District of Texas, a forensic review of CHIN's Samsung Galaxy 9 was completed by HSI. During a recent review of

12

the data extracted from the Samsung Galaxy 9, multiple images were discovered that depicted the **TARGET DEVICE**. Approximately 43 photographs that were taken of the **TARGET DEVICE** contained images of what appeared to be unidentified minor females. The photographs were taken using the Samsung Galaxy 9. The Samsung Galaxy 9 device also contained approximately 5 photographs of social media conversations with other unidentified females, approximately 6 photographs of GPS locations and directions, to include what appeared to be a Snapchat location containing the name of one of the unidentified minor females. Furthermore, the social media photographs contained portions of conversations that included CHIN's travel to meet at least one of the unidentified minor females.

39. The photographs were determined to be of the **TARGET DEVICE** based upon the distinct features of the cellular device, which included the cutout for the camera, the information bar at the top the **TARGET DEVICE**, and the identifiable screen cracks on both the upper left and upper right corners of the **TARGET DEVICE**. See the below photograph from the Samsung Galaxy 9 (left) and photograph of the **TARGET DEVICE** for reference.




40. The Android Wi-Fi profiles for the Samsung Galaxy 9 contained a Wi-Fi network from the **TARGET DEVICE**, with the Media Access Control (MAC) addresses of 3e:d7:6b:11:af:bc and 6e:8e:09:10:96:a2. This information is consistent with the usage of the Wi-Fi hotspot provided by the **TARGET DEVICE** as a network provider for the Samsung Galaxy 9.

41. The **TARGET DEVICE** is located at 210 Kanawha Boulevard West, Charleston, WV 25302, within the possession of HSI Charleston. It has been maintained in a manner to ensure that the contents of the phone are the same as at the time it was seized from CHIN.

42. For the above reasons, probable cause exists to believe that CHIN utilized Snapchat to engage in the enticement of minors to produce child pornography and that some of these Snapchat conversations took place using the **TARGET DEVICE**. As CHIN received child pornography as part of his Snapchat conversations with minors, probable cause also exists to believe that child pornography may be found on the **TARGET DEVICE** and that it was used to produce, receive, and possess child pornography.

## CONCLUSION

43. Based on the foregoing, I request that the Court issue the proposed search warrant, because based on the information set forth in this affidavit, there is probable cause to believe that evidence, fruits, and instruments are maintained on the **TARGET DEVICE.**

44. Based on my training and experience, I am aware that the search of cellular phones for criminal evidence can be a highly technical process that may require advanced training and a properly controlled environment. The search of a cellular phone can be equated to a scientific procedure, which is designed to protect the integrity of the evidence while recovering hidden, erased, compressed, password-protected, and other encrypted files. Because cell phones can be

vulnerable to tampering and destruction, the controlled environment of a laboratory may be essential to its complete and accurate analysis.

45. Rule 41 of the Federal Rules of Criminal Procedure authorizes the Government to seize and retain evidence and instrumentalities of a crime for a reasonable time to examine, analyze, and test them. I further request that the Court authorize the transfer of the **TARGET DEVICE** to other Government-authorized personnel or contractors, within or outside of this District, in the event that advanced expertise is needed to access the files subject to search and seizure under this warrant.

Respectfully submitted by:

_Andrew C. Hayden_
Andrew Hayden, Special Agent
Homeland Security Investigations

Signed and sworn to by telephone this 17th day of May, 2023.

HONORABLE DWANE L. TINSLEY
UNITED STATES MAGISTRATE JUDGE

15